Please call the next case. For the attorneys for the two parties, please approach the podium. And tell us who you are and who you represent, starting with the attorney for the appellant. Your Honor, my name is Chris Gerke, G-E-H-R-K-E, and I represent the appellant, James McKinney. State. My name is Kathy Warnick, and I represent the people of the state of Illinois. If you were here at the beginning, I have to be somewhere about 11 o'clock, which is unfortunate. But you'll still have 15 minutes each. But it will only be 15 minutes each, so please get your strongest point first, anytime you're ready. Your Honor, the police, the court, my name is Chris Gerke, as I said, and I represent the appellant, James McKinney. I'd like to begin by discussing issue number one of the appellant's brief, that being Mr. McKinney's right to a speedy trial. Your Honor, in this case, the state waited until the very last minute to make any substantive effort to obtain a key witness named Kenneth Jackson within the 120-day speedy trial term. They couldn't do it, and they filed a motion to extend the term. Under Illinois speedy trial statute, Your Honor, a trial court is only allowed to grant an extension of time. What do you contend is the very last moment? Your Honor, the state had a burden to show that it performed due diligence by beginning efforts within an appropriate amount of time. And according to this court in People v. Exxon, diligence is defined as a continual effort to accomplish something or care, caution, the attention required from a person in a given situation. It was the state's burden. Go ahead, Your Honor. So does the trial judge get to decide based on the facts whether the state acted diligently? The trial judge gets to, yes, Your Honor, the trial judge gets to make that decision. And under the facts of this case, the state started about three months before the trial date to look for this witness. Isn't that right? I think that's correct, Your Honor. Does that seem like the very last moment? Your Honor, the state began efforts. According to the state, they began efforts in September 2008. The trial date was, I believe, June of 2008, if I'm correct. The fact is, Your Honor, the state brought Mr. McKinney over from Pennsylvania, where he was in federal prison, and without knowing where Kenneth Jackson was, without having any real idea where this key witness was, they decided to initiate proceedings and start the speedy trial clock. Mr. McKinney was arrested, as I said, in February 2007. By the state's own admission, they waited more than a year and a half before they took any effort to find Kenneth Jackson, who they believe was the key witness. Is that a case of the preposition that the state needs to have their witnesses available at the time they charge people, at the time they extradite them, as opposed to your Ercolin case, Justice Wilson held, that when the state notified the chemist on the 119th day of the term, that was too late? Your Honor, there's no case that states that you must have all your witnesses in a row before you have to charge. I'm saying in this case, that's just evidence of the fact that the state didn't perform due diligence. But if it were proof of lack of due diligence, that's my point, then there would be a case agreeing with you. So if we were to say, if a court in the land anywhere had said that, yes, the state should have their witnesses in a row from day one, and since they don't, you should consider that to be lack of due diligence, somebody would have said that prior to just now. Your Honor, our position is that that is just one of many factors in the totality of the circumstances which shows that the state failed to perform due diligence. The state told the court. Tell us a couple more, because we've heard about this. Tell us a couple more. I'm watching the time for you, Mr. Herkey. I'm helping you out. I appreciate that, Your Honor. What the state told the trial court was that when they began looking for Kenneth Jackson, they determined he was in Hennepin County, Minnesota. In May 2009, they sent an ASA to Hennepin County, and they determined that he was actually living in, that the witness was actually living in Racine, Wisconsin. But before that happened, didn't the, they were in constant contact with the Hennepin County authorities, and those Minnesotans kept telling them, oh, yeah, he's here, and the only reason we're not finding, we're not serving him is because he's on to us, and he's avoiding the service. So the state, the state's attorney here had no reason to doubt what the Hennepin County authorities were telling them, did they? Your Honor, if you look to the record, what the information that the state was getting from Hennepin County authorities was hardly sort of concrete information as to Jackson's exact location. The state, the state didn't really give any, like from my report, it was the state's burden to show that they performed due diligence. The state didn't give any information as sort of, as to the basis of. Nobody in Hennepin County said to the state, he is not here. No, but what they did say, Your Honors, was that they believed he was there, but that he was just not coming out of his, of wherever they thought he was. He was avoiding service, and we know that defendants or witnesses who don't want to testify do that all the time. So is it unreasonable then for the state to accept that from the Hennepin County authorities, or should they have immediately started looking someplace else? I mean, I'm not sure why you're saying that their reliance on this information from Hennepin County shows lack of diligence. Your Honor, the state had a duty, as I said, to perform due diligence. The information they were getting seemed to indicate that not Hennepin County authorities didn't even really know where he was. They said that they believed he was there, but he wasn't coming out. They believed he was there, but he was avoiding service. Hennepin County authorities even told the state that they didn't have the resources to put an investigator on this individual to find him. In addition to that, Your Honors, the state, while Mr. Jackson was ultimately determined to be found in Racine, Wisconsin, the state had knowledge as far back as January 2006, more than three years prior, that that was Jackson's last known location. The police had interviewed Jackson there in connection with this case. But, Mr. Gerke, there was a three-year hiatus, and they had more current information that he was in Minnesota. And it doesn't say this in the record, but the record suggests that he did move to Minnesota and then move back to Racine. So if that's the case, I still am struggling with what is the lack of diligence that you are attributing to the state. What else could they have done? The state could have looked in Racine, Wisconsin or demonstrated that it looked in Racine, Wisconsin. It actually did when it became clear that he wasn't in Minnesota. That's true, Your Honor. But like I said, that was Mr. Jackson's last known location. They had his address there. His address was 1212 or 1220 North Wisconsin Street, Racine, Wisconsin. Three years before. Three years before. And the more current information that they had was that he was in Minnesota. And is it reasonable to assume that in a three-year period, a person can move from one state to another? It's reasonable to assume that, Your Honor, but the state didn't demonstrate that that's what occurred because they never needed to. Excuse me? Why would they need to? If they – our standard of use is use of discretion. Would that be correct? That's correct, Your Honor. So no – for us to agree with you, we'd have to find that this judge was irrational, that no rational person would have found that finding somebody who moves from St. Paul, Minnesota to Racine and back and forth should not easily be found. And I suggest that's rather unlikely. Do you have another – that was your first one. What's your next issue you'd like to argue? Next issue? My next issue is issue number four, Your Honors, involving the fact that Mr. McKinney's co-defendant pled guilty, and that was introduced throughout the trial. Throughout the trial, Your Honors, the state argued that both James McKinney and Jerome Wilkins shot at the decedent and that Wilkins then pled guilty to first-degree murder. Wilkins' guilty plea was not probative of any issue in this case, and the only reason for introducing it would have been to suggest Mr. McKinney's guilt by association. Now, was that raised in the trial court, or was this under plain error? This is under plain error, Your Honor. And if you can, the state didn't bring it up at this time. People v. White some four months ago came down explaining that in plain error, both under ineffective assistance counsel prong, is essentially the same as the – rather, it's also the same prong under plain error. You'd have to show that – it's up to the proponent here to show that it was – that it was an ineffective assistance counsel prong. So it's a little bit different. Is that your argument? Your Honor, my argument is that under People v. Sullivan, in that case, Your Honors, People v. Sullivan, the Illinois Supreme Court case found that where the trial – where the prosecutors introduced the fact that the defendant's co-defendant pled guilty at the opening – in the opening statement, in direct examination, and in the closing statement, that was a single continuous error. But in Sullivan's, it was a little bit more. The facts in Sullivan were a little bit different. They basically said, well, if the co-defendants were guilty, he was guilty, too. That's not quite what happened here. That's not exactly what happened here, Your Honor. But in Sullivan, our Supreme Court indicated that evidence that a co-defendant pled guilty is particularly prejudicial when a prosecutor is permitted to argue to the jury exclusively or implicitly that such evidence may be considered by them in determining the guilt of the defendant. Was that a plain error case, though? What about the fact that Mr. – whatever the names were – decided to change their testimony? Does that have any impact on the fact that, you know, they're saying something – they said something else 17 years before, and now they're saying something else? And is there any probative value for that – for bringing in that evidence? There's probative value for impeaching a witness with its prior statement. But in this case, Your Honor, the guilty plea was not brought in for impeachment purposes. And, in fact, the sole fact that Mr. – the sole fact that Mr. Wilkins pled guilty doesn't really – isn't really impeaching of anything. It's just the fact that he pled guilty to this offense. It assists him, doesn't it? Doesn't it make him more credible? So unlike Sullivan, where the State commented on two guys they brought in, two accomplices, one who refused to testify and one who testified, gave a couple answers, and quit talking, and then the State argued in closing, well, the fact they were here and they pled guilty in the past, they were with him, you know that, therefore this guy's guilty, Mr. Sullivan. In this case, the defendant, the co-defendant, gets called to testify and says, he wasn't involved in this, I did it. Just as I said in my plea of guilty, I took this low, this huge number of prison years, you can rely upon me, without definitely saying it, but it's clear the import of it, is I did my, I manned up and took the fall for what I did that he didn't do, let him go. Right? Right, Your Honor, you're right. Then how does that not help your client? I mean, the jury didn't buy it, but doesn't that help the client for the defendant, the co-defendant to say, I did it, not him, I manned up and pled guilty. Your Honor, there's a difference between a custodial sort of confession, which is what the State did introduce to impeach Mr. Wilkins, and the fact of a guilty plea. A guilty plea is, you know, sort of a judicial, an official judicial finding of guilt, where a person is represented by counsel and it's in front of a judge, compared to Mr. Wilkins' confession, which he gave when he was 14, he was in a room by himself with four police officers, his parents weren't there when he made his initial confession, and it was in the middle of the night. What's the practical difference, though, between the fact that, you know, he was guilty, he basically said, I did it, it wasn't anybody else, it was me, and, you know, I pled guilty and it came out that he served his sentence? I mean, what's the practical difference that you're trying to highlight? The practical difference, Your Honor, is that the, without the fact that Mr., without this official judicial determination that Mr. Wilkins pled guilty, if the State had only introduced the fact of his prior confession, the jury would have had to make a credibility determination between that prior confession, which I mentioned, you know, which he made when he was 14, and the fact that Mr. Wilkins, you know, said that I was the only one who did it at trial. That's a credibility determination the jury would have had to make. And adding the fact that Mr. Wilkins, you know, pled guilty to this offense, from the very opening statement, Your Honor, allowed the jury to sort of prejudge Mr. McKinney based upon what Mr. Wilkins pled guilty to. As early as I said, in the State's opening statement, the prosecutor argued that both McKinney and Wilkins were firing at the decedent and then pointed out, quote, Jerome Wilkins actually pled guilty to first-degree murder of Willis Myers for his participation in the murder. The State introduced the fact that Willis, that, introduced the fact that Mr. Wilkins pled guilty to the, to the murder again several times during direct examination and again implicitly in closing statement when it said that. But that helps your defendant. No, it doesn't, Your Honor. The fact that somebody went into court charged with this crime and said I did it, I'll take my time. First he says I did it to the police, and then, but with Wilkins, or with the co-defendant, and the, McKinney, and then his plea doesn't talk about McKinney, but he says he mans up and takes the fall for the crime he committed. Your Honor, the guilty plea is associated with the sort of confession in which Mr. Wilkins implicated both himself and Mr. McKinney. Right. The fact that he, as I said before, had that, had the fact of his guilty plea not been introduced, the State, the jury would have had a much more fair jury, would have had a much more fair credibility determination, and especially in light of Sullivan, which states that this information can never be considered unless it's introduced. His conviction is going to go in under Montgomery, if nothing else. How can it? Your Honor, under Montgomery, the State would have only been allowed to, or the State would have only been allowed to introduce the fact of the conviction and perhaps the date. That fact, no. They would still be able to cross him under 115.10.1, wouldn't they, with his prior confession to the police? You're right, Your Honor. He would absolutely be able to allow. Which they did. Right, which they did do. But the fact of the guilty plea itself, not, the guilty plea itself is extremely prejudicial, as recognized by this Court in People v. Sullivan, which states that. That was a Supreme Court case. But again, as Justice Connolly pointed out, that's, you know, completely different facts. The State there in Sullivan argued these two guys who took the fifth in front of a jury, which is also instantly reversible now, because it's not 1978. They commented, well, you know they were together. And they didn't argue that here. McKinney, or rather Wilkins, testified for McKinney. The State was foolishly enough to call him, but he testified that McKinney didn't do it. I don't know what more you can ask. And he did it himself. How often do you see that? Where a defendant says, I committed the crime, I took my time years ago, and this poor schlep is there, you know, that's terrible. I did it, not him. We don't ever see that. That may be true, Your Honor. However, our point is the simple fact that Mr. Wilkins said that he was the only person that shot him. Like I said, that's a credibility determination that should have been made without the fact that, without the official judicial, the weight of this judicial decision that Mr. Wilkins made, you know, pled guilty to his participation in this crime. And that was not raised down below, right? So, I mean, I can just tell you how, the whole story is out of school, but the trial lawyer for McKinney thought it was a great idea. If he didn't think it was a great idea, he would have been up and down screaming, no, no, no, judge, I don't want the jury to be informed in any way that Wilkins pled guilty to this offense. So it's only years later that when you get up for an appeal, and you're understaffed, and also it's certainly not your fault, your office's fault anyway, but several years later somebody says, hey, you know what, let's raise that issue. And our Supreme Court in White a few months ago cleared up, I thought, plain error by saying, you know what, let's take it short, hurt him. And you can't, I haven't heard anything how he's hurt by this. He's absolutely helped by this. You can't put it down. Do you have another issue? I do. Great. I would just like to know, did the State ever argue or suggest that this other guy's confession proved the defendant here to be guilty? Did they ever argue or present anything in that regard? That Mr. Wilkins' confession proved that Mr. McKinney was guilty? Did the State ever argue or suggest that the co-defendant's guilt established guilt on the defendant here? Not explicitly, Your Honor, but like I said in the opening. Not explicitly at all? Well, they didn't say that the fact that Mr. Wilkins pled guilty shows that McKinney is guilty, but they did say that both of them were shooting at Mr. McKinney and Mr. Wilkins pled guilty to this offense. I think it's fairly implicit. They had to have argued, though, did they not, that the jury could rely upon Wilkins' story to the police years ago. Because 11510 explicitly says they can do that, and I thought it was done here, which I think is what Justice Harris is asking. Didn't they argue that the confession of Wilkins, not the guilty plea, but the confession, his statement, which at the time of the arrest was me and McKinney did this bad job, they argued that. They put in evidence, didn't they? Yes, they did, Your Honor. There you go. I think that's what Justice Harris is asking. They put it in and they argued it. So they argued that the previous statement, the confession of Wilkins, should be proof held against McKinney. Yes, they used it to impeach Mr. Wilkins. Okay. The final issue I was planning on talking about today is ineffective assistance of counsel, which is issue five in Mr. McKinney's brief. During its opening statement, Your Honor, the defense counsel told the jury that it would show that two key witnesses only testified against McKinney after the charges against them were dropped. This statement elicited gasps from the jury. In fact, Your Honor, the opposite was true. Not only were the charges not dropped, they were elevated to felony charges. This created the exact opposite impression that defense counsel was trying to convey and was extremely prejudicial. But just like the other thing, how does that hurt the defendant? That kind of hurts the state. That's why they asked for a mistrial. How does that hurt your client? Your Honor, it hurts our client because the state was allowed to show that essentially that Mr. McKinney and his defense team was untrustworthy. They were liars throughout the entire course of the trial. As I said, the opening statement of the defense counsel was that the charges against this individual were dropped in exchange. Well, but the contrary argument could also be made, couldn't it? Because it showed that the state was willing to make deals to get evidence to convict the defendant. That's why the state's attorney asked for the mistrial, because the jury tends not to like those kinds of shenanigans. And I think, again, how does that hurt your client? It seems to me like that would be helpful to the defendant, to have the jury feel that this poor defendant is being wronged by the state offering deals to people in return for testimony. Your Honor, it doesn't help the defense, I don't think, in any possible way. The fact is, while that was the initial impression put on the jury during the opening statement, it hurts them because, well, first of all, defense, the prosecution introduced this, introduced the fact that the charges were actually elevated and basically showing that what defense counsel said in the opening statement wasn't true through Mr. Jackson's testimony, through Finley's testimony, through Officer Keller's testimony, through a stipulation, through certified copies of Mr. Jackson's misdemeanor felony charges, and again in closing argument. But it's a closing argument, which is your argument just now, and in your brief, and in your reply brief. But then in the closing argument at page 35 of your white brief, you put in what you think is, I assume what you thought was your best shot at the state to demonstrate that the state called the defense attorney a liar for that error that was made, even though the party stipulated, which would normally indicate to a trier effect, oh, they're agreeing on something, a mistake was made. Your instructed disregard, it was a mistake. So at 35 you have, the state finally referenced Jackson's convictions in closing argument, asserting, why wouldn't you believe what was in the grand jury transcript boxed? Kenneth Jackson, because his misdemeanor got dropped and got upgraded to a felony and took time in the pen for it, that was the great deal he got to make up a story about red? He doesn't say anything about the defense attorney discharging, does he? Well, not directly, Your Honor, no. But the fact is the defense attorney said in opening statement that the charges were dropped and in closing statement the prosecutor said the charges weren't dropped. And they agreed to that, right? Sidebar, you're mistaken, oh, I'm sorry, let's agree to tell the jury what happened. Well, they agreed to it in camera where defense counsel admitted that they didn't know the whole story and that they, and where even the state, in its brief, concedes that trial counsel did not have the complete information regarding  In addition to blowing the credibility of the defense, Your Honor, this also sort of shifted or lessened the burden of proof on the state. Rather than the state having to show that, you know, prove its case beyond a reasonable doubt, the state was allowed to point to, as you just quoted the defense counsel, that, you know, defense counsel said it was going to show you something, but it didn't. He didn't say that at all. Well, I, it showed that. He just said that Jackson took two years on a case. No, you know, he said, yeah, it wasn't a misdemeanor, it got upgraded from a misdemeanor to a felony and went to the penitentiary for two years. Your Honor. Why does that make him unbelievable? That was the argument. Well, Your Honor, the, I mean, this Court and other appellate courts have found that where a defense counsel makes a promise in an opening statement and fails to deliver on that promise in showing certain evidence, that, that can be an effective assistance of counsel. It can be if there's some effect on it. Well, Your Honor, as I stated before, Your Honor, this evidence, the jury was obviously paying close attention to this evidence. There was, literally, there were gasps from the jury. If you believe the state, which is probably foolish, but yeah. Oh, it's a horrible gasp. Oh, my God. Give me 12 other people. Do you have anything else? We do have to move on. None. Let's not do that. You have time to respond. Thank you, Your Honor. You have time to respond. Ms. Warnick. Good morning, Your Honors. May it please the Court. And in the interest of time, I will try to be as brief as possible. Briefly on the speedy trial issue, on May 27, 2009, there was a full hearing on whether the trial court should grant the state an extension of time under the speedy trial term. And at that time, not only did the state's attorney make all the representations about all the information they had from Hennepin County, the repeated assurances they received that the witness was, in fact, residing in Hennepin County. She provided to the court an investigator request slip from September 2008, almost nine months before the trial, to corroborate the state's efforts. Included in the record, there is a material witness certificate from November of 2008, eight months before the trial occurred. When it became obvious, she also supplied to the judge the name of the prosecutor who she was dealing with in Hennepin County. When the Hennepin County officials could not locate the witness, she actually flew out to Hennepin County on May 13 to try to locate this witness. Surely, if these aren't more than diligent efforts, I don't know what is. In addition, in this case, the question is, did the trial court abuse its discretion? And here the trial court said it all. He said, I find the state has exercised a yeoman's efforts in trying to find this witness. Now, on appeal, we go from due diligence to an argument that somehow the state should have known that the witness was actually in Racine County because there is a reference in the record that he was in Racine County in 2006. This reference is meaningless to the determination of diligence under the speedy trial issue. Not only factually, but the law tells us that the determination on appeal is the facts known to the trial court at the time he made the determination. And clearly, at the time he made the, excuse me, she made the determination, this factor was not brought up. The defense did not dispute the truth of the state's allegations. And in fact, in the reply brief, defense counsel says, that said, the prosecutors nonetheless decided to conceal this information from the trial court. That is a totally unfair attack upon the integrity of these state's attorneys who did everything that they could to try to find this witness and make their good forth efforts known to the trial judge. And the trial judge did not abuse his discretion. I'm sure the state public defender does not mean it personally. And I don't look at it as an attack on the state. I'm sure it's not personal, but it says what it says. With regards to the co-defendant pleading guilty, I think the resolution of the issue really revolves around what they're not objecting to. They're not objecting to the statement. They're not objecting to the fact that he served a sentence. They're not objecting to the fact that he got 25 years of incarceration for this offense. The only thing they're objecting to is that he pled guilty. Well, as a fundamental matter, it would be ridiculous for the jury not to have that piece of information. Well, that's not exactly what they're objecting to. They're objecting to the fact that the prosecution brought out the fact that he pled guilty. Yes, that's correct. But they are not objecting to the fact that the prosecution brought out the fact that he was sentenced to 25 years or that he's finished serving his sentence. But in addition, obviously, that evidence is relevant. And in addition to the point that Your Honor pointed out, that it could be possibly helpful to the defendant, it was relevant because it gave the co-defendant a motivation to come and take the blame totally because he'd already finished serving his sentence and he pled guilty. And in addition, it was relevant because when the defendant was arrested, he said to the police, the co-defendant's not going to testify against me. So it corroborated his statement to the police. And in addition, I agree that under a plain error analysis and under the recent case of Kenyatta White, this court doesn't even need to get to error. And plain error is particularly instructive in this case because prior to trial, the state put the defense on notice that they were going to admit this evidence. And in fact, the defense attorney at GG9 and 10 says, I'll take a look at it and see if there's anything I want redacted. So if there's ever a situation where the defense is on notice that this information has come out and has the opportunity to object, clearly they didn't object because they didn't want to object, whatever. I agree with Justice Quinn that it may have helped them. It could have helped them, yes. It was a prior strategy to not object to it. Absolutely. It was also relevant to the state, but it could have also been relevant to the defense. Now, GG9 and 10, is that the plea? No, that's prior to trial. That's when the state says, we want to put you on notice that we're going to use this evidence. Whatever. Of the co-defendant's statement. Okay, as opposed to the plea. Exactly. The co-defendant's statement and the defense attorney says, I'm going to take a look at it and let you know if I want to redact it in any way. With regards to the ineffective assistance of counsel claim, the argument on appeal is that a single comment during opening statement could provide the basis for ineffective assistance of counsel under Strickland. Apparently what the attorney did is he said that the charges had been dropped was holding a rap sheet that didn't indicate to him that the charges were then reinstated and upgraded. What the parties did then is they took a look at the situation and the court tried to carve out the best way of informing the jury about the accuracy of the information. The court, as a matter of fact, makes a statement that you weren't trying to pull. The attorney says, I wasn't trying to pull anything. And the court says, yes, you didn't have all the information. There was nothing personally discrediting to the attorney. There was nothing personal about it. The parties were just purely trying to give the jury the accurate information. And it bears noting that even in closing argument, defense counsel still uses information to his benefit by arguing that two years wasn't a bad gig for all these guns and that the witness only talked after he had been arrested and that this information wasn't brought before the grand jury. So even despite the fact of a statement, an opening statement, he still uses information to his benefit as a matter of trial strategy. And certainly there's – You would admit the defense attorney would be in a less credible posture before this jury as a result of this incident. Don't you think it would have destroyed his credibility to some degree at least? I would not really concede that because I don't – first of all, the jury was instructing that that argument is not evidence. And secondly, it was a minor matter that the attorney made a statement of fact, which was later – it wasn't really pronounced before the jury. It wasn't – there was no – well, he said this and this was a mistake. It was purely a half, I guess, of the rest of the story. And so therefore that it wasn't a misstatement or a factual inaccuracy and that it was not the whole entire actuality of what happened, I wouldn't say it discredited him and certainly not personally discredited him. He still uses information in closing argument, which I think showed his  And so I think that's the only way that the defendant could ever establish prejudice based on this one single comment. So for all those reasons, we would ask that the defendant's conviction be affirmed. Thank you. Thank you. Mr. Durkee, briefly. Your Honor, initially touching upon what counsel just said about the efforts the state took, I'd like to remind the Court that what counsel's talking about when they sent someone to Hennepin County, Minnesota, that wasn't until May 13th of 2009. McKinney was arrested in February 2007. From February 2007 – for two years after Mr. McKinney's arrest, the only efforts the state took was file four subpoenas. Three of those subpoenas were filed in the final month of the speedy trial term. Of those three subpoenas, two of them were filed in the wrong state and the one that was filed in the correct state was filed the same day as the motion to extend the term. I'd like to remind the Court that while the state did – it's unquestionable the state made some efforts to locate Jackson, but it's our position that they took it too late. They took it more than two years after Mr. McKinney's arrest. In addition, I'd also like to point out the fact that the state did, you know, not inform the Court that they had actual knowledge that Jackson was in Racine in 2006. While they did, you know, indicate that they received some sort of information which they didn't really articulate, you know, where it come from or exactly what that information was, that Jackson was in Hennepin County. Again, they didn't give an address. The county has a population of over a million people. They just didn't – they didn't establish clearly that they had – they could be confident of where Jackson was at that time. As for issue number four, the Court of Counsel argued that the guilty plea was relevant. The guilty plea had no relevance whatsoever. The sole fact of the guilty plea had absolutely no relevance as to, you know, whether Mr. Wilkins was or wasn't going to testify. If they had introduced the factual basis of the guilty plea, that might have relevance, but the sole fact of the guilty plea had no relevance. And as to the final issue involving ineffective assistance of counsel, this wasn't a single minor incident that, you know, that had no real effect on the trial. This was a promise made by counsel at opening statement of, you know, blockbuster type impeachment where, you know, where counsel was going to show that these witnesses only testified because the charges against them were dropped. As I pointed out earlier, the State refuted, you know, refuted that by introducing it through – introducing the fact that charges were actually elevated through several attorneys – or through several witnesses, rather, and through multiple pieces of evidence, which blew the credibility of defense counsel and of Mr. McKinney, and which also shifted the burden of proof sort of onto defense counsel. And for the reasons I've discussed today and for the reasons in our briefs, we respectfully request that this court find for Mr. McKinney. Thank you. Thank you very much. This case will be taken under advisement, and this court will be adjourned.